**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 24-31596** |
| **MMA LAW FIRM, PLLC** | § | |
| | § | |
| **DEBTOR** | § | |
| | § | |
| **MMA LAW FIRM, PLLC** | § | **ADVERSARY NO.** |
| | § | **24-03130** |
| **Plaintiff** | § | |
| **v.** | § | |
| | § | |
| **LABORDE EARLES LAW FIRM,** | § | |
| **LLC** | § | |
| | § | |
| **Defendant** | § | |

**AMENDED COMPLAINT**

MMA LAW FIRM, PLLC, (**"MMA"** or **"Debtor"**), files this Amended Complaint against

Laborde Earles Law Firm, LLC, pursuant to FED. R. BANKR. P. 7001(1) and (7), and respectfully

shows the Court as follows:

**JURISDICTION, VENUE AND PARTIES**

1.      This is an adversary proceeding brought by the Debtor for (a) violation of the automatic

stay under section 362 of Title 11 of the United States Bankruptcy Code; b) declaratory judgment

regarding the determination of property of the bankruptcy estate; and (c) turnover of property of

the estate.

2.      This Court has subject matter jurisdiction over this adversary proceeding, pursuant to

28 U.S.C. §§ 157 and 1334(b).

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)

and this Court may enter a final order consistent with these statutes and Article III of the United

States Constitution.

4.        Venue is proper in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to 28 U.S.C. § 1409.

5.        MMA Law Firm, PLLC is the Debtor in Case No. 24-31596 pending in the Southern District of Texas and can be served through its undersigned proposed counsel.

6.        Laborde Earles Law Firm, LLC can be served with this Complaint and summons through its registered agent David C. Laborde at 1901 Kaliste Saloom Road, Lafayette, LA 70508.

7.        Laborde Earles was served with the original Complaint and Summons on July 2, 2024. (ECF No. 9)

8.        The Debtor hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### RELEVANT BACKGROUND FACTS

9.        MMA Law Firm, PLLC ("**Debtor**") is a litigation law firm based in Texas.

10.       Following hurricanes Laura, Delta, Zeta, and Ida, the Debtor represented thousands of storm victims with property damage claims against their insurance companies ("**MMA Clients**").

11.       The Debtor executed contingency fee contracts with the MMA Clients, entitling it to a contingency fee and reimbursement of expenses ("**Contingency Fee Contracts**").

12.       The Debtor prosecuted claims and filed thousands of lawsuits on behalf of the MMA Clients throughout Louisiana ("**MMA Cases**").

13.       On March 3, 2023, Judge James D. Cain, Jr., a United States district judge of the United States District Court for the Western District of Louisiana, issued an order suspending the law

licenses of all attorneys affiliated with the Debtor for ninety days (**"Suspension Order"**).

14.      Pursuant to the Suspension Order, the Debtor was ordered, among other things, to notify the MMA Clients of the suspension and that they had the option of either retaining new counsel or remaining with the Debtor.

## AGREEMENT BETWEEN THE DEBTOR AND LABORDE EARLES

15.      On March 6, 2023, three days after the Suspension Order was issued, the Debtor was approached by Digger Earles and David Laborde, partners at Laborde Earles Law Firm, LLC (**"Laborde Earles"**).

16.      Laborde Earles, a Louisiana-based law firm that routinely represents clients with storm claims in Louisiana, was eager to enter into an agreement with the Debtor to participate and profit from the MMA Cases following the Suspension Order.

17.      On March 9, 2023, the Debtor provided Laborde Earles with a detailed breakdown of the MMA Cases, including the total number of lawsuits, the total amount of claims, and estimated valuations.

18.      By March 18, 2023, the Debtor and Laborde Earles reached an agreement whereby Laborde Earles would enter into new contingency fee agreements with the MMA Clients.  Upon resolution of the MMA cases, the Debtor would be entitled to 62% of the contingency fee from any settlement or award received by the MMA Clients, with Laborde Earles receiving the remaining 38%.  Each party would also be entitled to reimbursement of actual expenses incurred in representing the MMA Clients in the MMA Cases (the, **"Agreement"**).

19.      On the same day that the Agreement was reached, Mr. Earles sent the Debtor a letter intended for the MMA clients (the **"Client Letter"**), informing them that Laborde Earles agreed

to take over the MMA Cases and assist the MMA Clients with their pending storm claims[1].

20.     On March 20, 2023, Laborde Earles confirmed in writing that the Debtor was authorized to send engagement agreements to the MMA Clients on behalf of Laborde Earles that provided for a 40% contingency fee, plus reasonable expenses.

21.     On April 8, 2023, the Debtor updated Laborde Earles on all executed Contingency Fee Agreements with the MMA Clients and provided Laborde Earles with the status of these cases. The following day, the Debtor informed Laborde Earles in writing that a total of 3,665 Contingency Fee Agreements had been sent to the MMA Clients on Laborde Earles' behalf, with 855 MMA Clients having signed the agreements. The Debtor then requested permission to send another 2,600 contingency fee agreements that day, to which Mr. Earles responded, "Roll with it."

22.     On April 10, 2023, Laborde Earles confirmed its approval for the Debtor to send a letter to the MMA Clients, on Laborde Earles' behalf, detailing how to submit paperwork to Laborde Earles for cases pending in the Eastern District of Louisiana.

**MORRIS BART THREATENS TO SUE LABORDE EARLES**

23.     After the Suspension Order was issued, numerous law firms in Louisiana, began pursuing the MMA Clients in hopes of capitalizing on the situation. One such firm was Morris Bart Law (**"Morris Bart"**), one of the largest plaintiffs' firms in Louisiana, which devised a marketing strategy aimed at soliciting as many MMA Clients as possible.

24.     On April 10, 2023, Morris Bart sent a letter to Laborde Earles threatening legal action, asserting that it would file a lawsuit for tortious interference and ethics complaints against Laborde Earles for contacting MMA Clients who were allegedly represented by Morris Bart after the entry of the Suspension Order (**"Morris Bart Letter"**)[2].  In this letter, the firm reiterated its threats,

---

[1] Exhibit 1: Client Letter drafted by Mr. Earles.
[2] Exhibit 2: Morris Bart Letter

remarking, "Your latest actions and deal-making with MMA are equally noteworthy."

<u>**SHOW CAUSE HEARING**</u>

25.     On April 11, 2023, one day **after** the Morris Bart letter was sent to Laborde Earles, Judge

Cain, opened a miscellaneous proceeding (Case No. 2:23-mc-00049) and issued an order requiring

Mr. Moseley to personally appear in his courtroom on April 26, 2023, to *"provide the status of the*

*agreement between MMA and the Laborde Earles Law Firm."* (the **"Show Cause Order"**)[3].

26.     It remains unclear how Judge Cain became aware of the agreement between Laborde

Earles and the Debtor, and what prompted him to issue the Show Cause Order just one day after

the Morris Bart Letter was delivered.  While the Debtor does not have personal knowledge at this

time, it appears that Judge Cain may have had *ex parte* communications that resulted in the

issuance of the Show Cause Order.  This belief is based on and supported by other instances of *ex*

*parte* communications that Judge Cain acknowledged in prior MMA Client hearings, as outlined

below in the section titled, *"Judge Cain's Ex Parte Statements and Personal Attacks"*.

27.     On April 26, 2023, Mr. Moseley appeared in the Western District of Louisiana in response

to the Show Cause Order (**"Show Cause Hearing"**). Judge Cain did not preside over the Show

Cause Hearing; instead it was handled by Former Magistrate Judge Kay.[4]

28.     During the Show Cause Hearing, Mr. Marks, an attorney from Morris Bart, notified the

Court that Laborde Earles was contacting MMA Clients, claiming many contacted clients were

now represented by Morris Bart, referencing the allegations contained in the Morris Bart Letter.[5]

29.     Former Judge Kay called Mr. Earles forward to answer questions regarding the

relationship between his firm (Laborde Earles) and the Debtor. Mr. Earles made the following

---

[3] <u>Exhibit 3</u>: Show Cause Order
[4] Magistrate Judge Kay retired from the bench on or about January 1, 2024, and is therefore referred to as "Former Judge Kay" throughout this Amended Complaint.
[5] <u>Exhibit 4</u>: Transcript Show Cause Hearing (Page 13, Lines 17-23)

representations to the Court:

> "You have my assurance, Your Honor. There is also no agreement between Laborde Earles and MMA. Mr. Moseley -- and I don't know if he just chose the wrong word, but he said that he is associated with Laborde Earles. There **is no association, no agreement, no affiliation at all**."[6]

30.    The above representations made by Mr. Earles were false at the time made.

31.    In response to the allegations made by Morris Bart that Laborde Earles was sending letters and contacting MMA Clients who were allegedly now represented by Morris Bart, Mr. Earles stated,

> "That letter was sent -- MMA sent that letter from MMA to their clients supposedly unaware that Mr. Marks had assumed representation of him.  Then sent a letter on my firm's letterhead to those clients.  **That did not come from me or my firm in any way.**"[7]

32.    This representation was also false at the time it was made.

33.    However, as previously discussed above, the Client Letter that was sent to the MMA Clients (that are now allegedly represented by Morris Bart) was drafted by Mr. Earles, signed by him, and sent at his direction. (See Exhibit 1).

34.    Mr. Earles' representations that the letter did not come from him and that Laborde Earles had no agreement or affiliation with the Debtor were entirely fabricated, as evidenced by the numerous communications and agreements discussed in detail above between the Debtor and Laborde Earles.

---

[6] <u>Exhibit 4</u>: Transcript Show Cause Hearing (Page 19, Lines 11-16)
[7] <u>Exhibit 4</u>: Transcript Show Cause Hearing (Page 18, Lines 18-22)

## DIRECT EMAIL FROM FORMER JUDGE KAY TO THE DEBTOR AND SECRET MEETING WITH JUDGE CAIN

35.     It appears that Former Judge Kay took the matters regarding Mr. Moseley and MMA very personally, exceeding the appropriate actions expected of a federal magistrate.

36.     On May 25, 2023, approximately one month after the conclusion of the Show Cause Hearing, Former Judge Kay **emailed Mr. Moseley directly**, copying Judge Cain and other district court judges to the email (**"Judge Kay Email"**)[8].

37.     The subject line of the email read, "In secret audio, lawyer accused of fraud lays out plans to keep Louisiana insurance lawsuits going." In the body of the email, Former Judge Kay wrote, "Just in case you missed it."

38.     Notably, Former Judge Kay did not include either Mr. Moseley's counsel or the Debtor's counsel in her *ex parte* email, despite knowing that Mr. Moseley was represented by counsel who appeared on his behalf at the Show Cause Hearing.[9]

39.     The Debtor found the email to be both threatening and intimidating.

## SECRET MEETING WITH JUDGE CAIN IN LOUISIANA

40.     On June 20, 2023, approximately one month after Former Judge Kay emailed Mr. Moseley directly, another hearing was held by Former Judge Kay where Mr. Moseley was ordered to appear (**"June Hearing"**).

41.     After the conclusion of the June Hearing, Mr. Moseley left the courthouse and encountered several attorneys, including Ravi Sangisetty, JP Coussan, Tanner McGee, and others (**"Attorneys"**).   The Attorneys informed Mr. Moseley that they had just attended a meeting in Judge Cain's conference room (**"Secret Meeting"**), which included Mr. Earles of Laborde Earles

---

[8] Exhibit 5: Judge Kay Email
[9] Exhibit 4: Transcript from Judge Kay Hearing (Page 2, Lines 8-13)

and Judge Cain.

42.      The Attorneys indicated that the purpose of the Secret Meeting was to discuss the status of the Debtor and the MMA Cases, including directives for the Attorneys who attended the Secret Meeting to execute new engagement agreements with the MMA Clients, implying that MMA would not receive any proceeds from the MMA Cases.

43.      The Debtor was not invited to the Secret Meeting.

44.      The outcome from the Secret Meeting squarely aligned with an order subsequently issued by Judge Cain, without notice to the Debtor, holding that the Debtor and its attorneys had no property or ownership interest in any potential proceeds from the MMA Cases (**"Judge Cain Order"**).

45.      On June 7, 2024, the Fifth Circuit vacated the Judge Cain Order, ruling that Judge Cain violated the Debtor's due process rights.[10]

## JUDGE CAIN'S COMMITTEE

46.      After the entry of the Suspension Orders, Judge Cain also established a committee to address the fallout of the MMA Law Firm (**"Committee"**).

47.      The Committee included some attorneys representing insurance companies that are defendants in the MMA Cases. The Debtor learned that during at least one meeting, Judge Cain specifically discussed pending matters related to the Debtor, including his personal opinion on the Fifth Circuit's decision to vacate the Judge Cain Order and its implications for the Debtor.

48.      Not only was the Debtor never made aware of the Committee, but counsel for the Defendants were included in these committee meetings having *ex parte* communications with Judge Cain about the Debtor and orders issued against the Debtor.

---

[10] Exhibit 6: Fifth Circuit Opinion

## JUDGE CAIN'S EX-PARTE STATEMENTS AND PERSONAL ATTACKS

49.        After reviewing multiple transcripts from hearings that took place before Judge Cain, it appears that Judge Cain, like Former Magistrate Judge Kay, took the matters regarding Mr. Moseley and the Debtor very personally, exceeding the appropriate actions expected of a federal judge.

50.        On October 20, 2022, during the very first hearing before Judge Cain, where no evidence was presented by any party, Judge Cain expressed concern about duplicate cases filed by the Debtor on behalf of its clients (**"October Hearing"**).

51.        Without an evidentiary hearing and without having provided prior notice of the Court's concerns related to "duplicate case filings", Judge Cain stated,

> "We're going through them. You'll be sanctioned $200 per duplicate. So that will be -- well, if the first case is valid, so it'll stay. The other ones you're going to be sanctioned on. I'm telling you don't ever come back to my court. God forbid we ever have another hurricane, but I do not ever want to see this again. Hear me. **Tell your partners in Houston stay the frick out of my court with this kind of trash**. You see this person right over here? That's Marshal Gallow with the United States Marshal Service."[11]

52.        After the October Hearing, the Debtor investigated the alleged duplicate filings and found two key issues.  First, 13 lawsuits were duplicated due to timeouts in the ECF Filing system, leading the Debtor re-file each of the 13 cases.  Second, the Debtor initially filed one lawsuit for 80 clients under Rule 20, but after the Court ordered severance the Debtor re-filed each case individually, resulting in duplicates. Judge Cain admonished the Debtor to "stay the frick out of" his Court without first allowing the Debtor the opportunity to investigate the matter.

53.        During the same hearing Judge Cain acknowledged that he received *ex parte*

---

[11] <u>Exhibit 7</u>: October Hearing Transcript (Page 51, Lines 5-14)

communications by asserting that *"somebody sent him the video off a Facebook page"* in which the Debtor commented on the ECF Filing system utilized in his Court, asserting that the Debtor "broke the system" by filing a high volume of cases (**"Facebook Post"**). Judge Cain expressed his discontent with the Debtor's Facebook Post, stating, "I did not appreciate your cavalier comments in that video about my court, we broke the system, we filed, we set a record. No, you didn't break our system."[12]

54.     On August 8, 2023, Judge Cain conducted a hearing where Mr. Moseley addressed the Court's Suspension Order (**"August Hearing"**). Specifically, Mr. Moseley argued that it was inappropriate for Judge Cain to suspend "his law license" in Louisiana, given that he had never sought issuance of, or been issued a license to practice law in Louisiana nor had he personally practiced law there.[13] In response, Judge Cain stated, "Well, I'm not going to let you meddle around in any of these cases without – unsupervised. So yeah, your suspension, you can take it to the U.S. Fifth Circuit if you don't like how it went down."[14]

55.     At the conclusion of the August Hearing, Mr. Moseley told Judge Cain, *"An imperfect process doesn't equate to a scheme. I know you think that we had nefarious action ..."* Judge Cain interrupted him, revealing once again that Judge Cain was conducting his own independent investigation and engaging in *ex parte* communications:

> "The reason I think it is my – from **very reliable sources, and mine are pretty reliable…**"[15]

56.     Finally, it appears that this is not the first time that Judge Cain has been accused of

---

[12] <u>Exhibit 7</u>: October Hearing Transcript (Page 29, Lines 17-20)
[13] <u>Exhibit 8</u>: August Hearing Transcript (Page 131, Lines 19 through 22).  In addition, the Debtor hired licensed attorneys in Louisiana to handle all Louisiana matters while Mr. Moseley represented clients in Texas where he is licensed.
[14] <u>Exhibit 8</u>: August Hearing Transcript (Page 134, Lines 1-8)
[15] <u>Exhibit 8</u>: August Hearing Transcript (Page 159, Lines 2-6)

engaging in communications that cast doubt on the impartiality of an ongoing legal proceeding in the Western District of Louisiana.[16]

**TOTAL CASES TAKEN BY LABORDE EARLES**

57.     Following the comments and orders from Judge Cain and Former Judge Kay, Laborde Earles ceased all further communications with the Debtor regarding the MMA Cases.

58.     Before halting communications with the Debtor, Laborde Earles executed retainer agreements with 1,811 MMA Clients in the MMA Cases as part of the Agreement reached with the Debtor (**"LE/Debtor Cases"**).

59.     A spreadsheet detailing the LE/Debtor Cases is attached as Exhibit 10.[17]

**MOTIONS FILED BY LABORDE EARLES OBJECTING TO THE DEBTOR'S INTEREST IN ATTORNEY'S FEES AND COSTS**

60.     Not only did Laborde Earles ignore the Agreement with the Debtor, but it also took further action by filing motions in Louisiana courts objecting to the Debtor's interest in attorney's fees and costs in the MMA Cases.

61.     Attached to this Amended Complaint are nine examples of the numerous motions filed by Laborde Earles.[18]

**BANKRUPTCY FILED AND NOTICE PROVIDED**

62.     On April 9, 2024, the Debtor filed a Chapter 11 bankruptcy petition.

63.     In its bankruptcy schedules, the Debtor disclosed claims against Laborde Earles for "possession of attorney's fees and expenses that belong to the Debtor".[19]   Specifically, the Debtor

---

[16] Exhibit 9: Article from Louisiana Record.
[17] Exhibit 10: Spreadsheet of cases.
[18] Exhibit 11: Motions to Exclude filed pre-petition.
[19] Exhibit 12: Schedules (Page 136)

performed significant legal work, including filing lawsuits, and incurring expenses in the LE/Debtor Cases, asserting that it is entitled to attorney's fees and expenses from Laborde Earles.

64.    On April 23, 2024, the Debtor sent Laborde Earles notice of its bankruptcy filing via email to two separate email addresses (the, **"Notice"**)[20].

65.    In the Notice, the Debtor specifically 1) notified Laborde Earles of its bankruptcy filing; 2) explained that the bankruptcy petition operates as a stay including attempts to obtain possession of the Debtor's property; and 3) provided Laborde Earles with contact information for the Debtor's counsel.

66.    Additionally, on April 12, 2024, the Bankruptcy Noticing Center provided Laborde Earles with notice of the Debtor's bankruptcy filing via U.S. mail.[21]

## EXAMPLES OF INTENTIONAL VIOLATIONS BY LABORDE EARLES

67.    Despite multiple notices, Laborde Earles continued legal actions against the Debtor and attempted to exercise control over estate property as it relates to the LE/Debtor Cases.

68.    The Debtor is aware of at least two post-petition instances where Laborde Earles intentionally sought to exclude the Debtor from collecting property of the estate (*i.e.* the Debtor's interest in attorney's fees and costs) after having notice of the Debtor's Chapter 11 bankruptcy filing.

## First Client: Thomas Bullock

69.    On or about February 24, 2022, Thomas Bullock executed a contingency fee agreement, which included reimbursement of expenses, with the Debtor to assist him in claims against his insurance carrier, State Farm Fire & Casualty Company **("State Farm")**.

70.    On August 23, 2022, the Debtor, on behalf of Mr. Bullock, filed a lawsuit against State Farm

---

[20] Exhibit 13: Bankruptcy Notice Letter
[21] Exhibit 14: BNC Notice to Laborde Earles of bankruptcy filing

for breach of contract and various statutory violations in the United States District Court for the Western District of Louisiana (**"Bullock Case"**).[22]

71.    In addition to drafting and filing the complaint in the Bullock Case, the Debtor performed significant legal work and incurred expenses in the Bullock Case, including filing fees.

72.    On May 29, 2024, Laborde Earles entered into a settlement agreement in the Bullock Case (**"Bullock Settlement"**).

73.    On the same day that the Bullock Settlement was reached, Laborde Earles filed a Motion for Release of Funds in the Louisiana District Court (**"Bullock Motion"**)[23].

74.    In the Bullock Motion, Laborde Earles specifically requested an order that excluded the Debtor as a payee from a settlement check issued by State Farm in the Bullock Settlement. The proposed order attached to the Bullock Motion requested that State Farm exclude the Debtor as a payee on the settlement check.[24]

75.    Laborde Earles did not file a motion requesting relief from the automatic stay or permission to file the Bullock Motion.[25]   What is particularly egregious about the Bullock Motion is that Laborde Earles represented to the Louisiana District Court that the relief requested in its motion *"does not impact the pending bankruptcy in any way"*, further acknowledging their notice and knowledge of the bankruptcy filing.

76.    Instead of contacting the Debtor's counsel to reach an agreement or seeking relief from the Bankruptcy Court, Laborde Earles filed the Bullock Motion in an attempt to circumvent the Bankruptcy Court and the Debtor altogether, aiming to take possession and control of the Debtor's property, specifically the attorney's fees and costs that are property of the estate.

---

[22] <u>Exhibit 15</u>: Lawsuit filed for Bullock by the Debtor.
[23] <u>Exhibit 16</u>:  Bullock Motion
[24] <u>Exhibit 17</u>:  Bulluck Proposed Order
[25] <u>Exhibit 18</u>: Docket in Bankruptcy Case

**Second Client : Bently Senegal**

77.    On or about July 28, 2022, Mr. Bently Senegal executed an attorney employment contract with the Debtor to assist him in claims against his insurance carrier, State Farm, on a contingency fee basis including reimbursement of expenses.

78.    On August 25, 2022, the Debtor, on behalf of Mr. Senegal, filed a lawsuit against State Farm for breach of contract and various statutory violations in the United States District Court for the Western District of Louisiana ("**Senegal Case**")[26].

79.    The Debtor performed significant legal work and incurred expenses in the Senegal Case, including the payment of filing fees.

80.    On April 29, 2024, after being notified of the Debtor's bankruptcy filing, Laborde Earles filed a Motion for Release of Funds in the Senegal Case ("**Senegal Motion**")[27].

81.    In the Senegal Motion, Laborde Earles acknowledged that it entered into a final settlement on behalf of Mr. Senegal and requested an order from the Louisiana District Court that excluded the Debtor as a payee on settlement proceeds. In addition, Laborde Earles represented in the Senegal Motion that the plaintiff intends to also file a Motion to Set Attorney Fees and Costs and Expenses to address any lingering or ongoing concerns about the amount of fees, costs and expenses that may be owed to the Debtor.  The proposed order attached to the Senegal Motion specifically requested an order that the settlement proceeds do NOT include the Debtor as a payee.[28]

82.    Similar to the Bullock Case, Laborde Earles failed to seek permission from the Bankruptcy Court to file the Senegal Motion.

---

[26] Exhibit 19 – Senegal Lawsuit filed by the Debtor.
[27] Exhibit 20 – Senegal Motion
[28] Exhibit 21 – Senegal Proposed Order

83.    (The Bullock Motion and the Senegal Motion are collectively referred to as the **"Motions to Exclude"**).

<u>**ADVERSARY FILED AND TRO**</u>

84.    On June 28, 2024, the Debtor filed an Adversary Proceeding against Laborde Earles for intentional violations of the automatic stay.

85.    On August 2, 2023, the Court entered an Agreed Preliminary Injunction **("Injunction")** in the Adversary.[29]

86.    Pursuant to the Injunction, Laborde Earles was permitted to continue prosecuting and settling the LE/Debtor Cases, with all funds awarded as attorney's fees or costs reimbursements to be held in trust until further order of the Bankruptcy Court.

87.    Since the entry of the Injunction, the Debtor is aware of at least 36 LE/Debtor Cases that Laborde Earles has settled, totaling $906,514.47 in settlement funds.  Furthermore, the Debtor has provided Laborde Earles with case expenses on approximately 100 additional LE/Debtor Cases that are currently in the settlement stage.

<u>**CAUSE OF ACTION #1 – VIOLATIONS OF THE AUTOMATIC STAY**</u>

88.    The Debtor asserts that Laborde Earles violated §§ 362(a)(1) and (a)(3) of the Bankruptcy Code by filing the Motions to Exclude as discussed above in paragraphs 62 through 83 and incorporated into Cause of Action No. 1.

89.    As discussed in paragraphs 69 and 78 of this Amended Complaint, the Debtor entered into contingency fee agreements with Mr. Senegal and Mr. Bullock (collectively, the **"Two MMA Cases"**). Pre-petition, the Debtor initiated litigations on behalf of these clients against insurance companies[30]. Pursuant to the contingent fee agreements, the Debtor is entitled to attorney's fees

---

[29] <u>Exhibit 22</u> - Injunction
[30] Paragraphs 70 and 77.

and reimbursement of expenses in the Two MMA Cases ("**Fees and Costs**").

90.    The Fees and Costs were earned and incurred by the Debtor prior to its Chapter 11 filing on April 9, 2024.

91.    Laborde Earles finalized settlements in the Two MMA Cases, yet the Fees and Costs have not been paid to the Debtor.

92.    Section 541(a) of the Bankruptcy Code defines "property of the estate" to include all legal or equitable interests of the debtor in property as of the commencement of the case.  11 U.S.C. § 541(a)(1). Therefore, the Debtor's interest in the Fees and Costs in the Two MMA Cases constitutes property of the estate.

93.    A willful violation of the automatic stay contains three elements: 1) the defendant must have known of the existence of the stay; 2) the defendant's acts must have been intentional; and 3) the acts must have violated the stay. *Garza v. CMM Enters., LLC (In re Garza),* 605 B.R. 817, 828 (Bankr. S.D. Tex. 2019)

94.    The Debtor properly notified Laborde Earles on several occasions as explained in Paragraphs 64-66 above.  Post-petition, after having received notice of the Debtor's Chapter 11 Case, Laborde Earles filed the Motions to Exclude in the Two MMA Cases, seeking to exclude the Debtor as a payee in the settlement proceeds.

95.    Laborde Earles admitted that it received notice of the Debtor's bankruptcy filing prior to filing the Motions to Exclude.

96.    The Debtor asserts that Laborde Earles' actions violated Section 362 of the Bankruptcy Code when it filed the Motions to Exclude.  Numerous courts, including the Fifth Circuit, have imposed joint and several liability against parties and their counsel for willful stay violations. *Young v. Repine (In re Repine),* 536 F.3d 512 (5th Cir. 2008).

97.     Laborde Earles' conduct was both intentional and willful, as evidenced by their pursuit of the Motions to Exclude for their benefit, rather than merely advising their clients.

98.     Laborde Earles was financially motivated to secure all Fees and Costs to the exclusion of the Debtor.

99.     Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.  11 U.S.C. §362(a)(3). In order to sustain an action for violation of Section 362(a)(3), the Debtor must assert that: 1) a property interest in invoked; 2) the property interest is property of the estate; and 3) there occurred an act to obtain possession of the estate property or there existed an act to exercise control over estate property. 11 U.S.C. §362(a)(3).

100.    In this instance: 1) The Debtor holds an interest in the Fees and Costs pursuant to the contingent fee agreements and the work performed in the Two Cases, which remain unpaid; 2) The Fees and Costs are property of the bankruptcy estate; and 3) Laborde Earles' filing of the Motions to Exclude represents a clear act to obtain and control estate property, as they sought to exclude the Debtor as a payee from the settlement funds on multiple occasions.

101.    Section 362(a)(1) of the Bankruptcy Code provides that a petition filed under section 301, 302,  or 303 of this title . . . operates as a stay, applicable to all entities, of … the commencement or continuation of a judicial proceeding against the debtor that was or could have been commenced before the filing of the bankruptcy case, or to recover a claim against the debtor that arose before the commence of the bankruptcy filing.  11 U.S.C. § 362(a)(1)

102.    Laborde Earles' Motions to Exclude constitute judicial proceedings initiated post-petition that could have been commenced prior to the Debtor's Chapter 11 filing.

103.    Laborde Earles had actual notice of the Debtor's Chapter 11 filing on multiple occasions

before filing the Motions to Exclude.  Additionally, Laborde Earles was explicitly informed that such actions would violate the automatic stay. Laborde Earles was also well aware of the Debtor's asserted interest in the Fees and Costs, as acknowledged in the body of the Motion to Excludes where Laborde Earles states that the relief requested *"does not impact the pending bankruptcy in any way"*, further acknowledging their notice and knowledge of the bankruptcy filing.

104.  Laborde Earles failed to seek relief from the automatic stay prior to filing the Motions to Exclude.

105.  Laborde Earles, a seasoned law firm, should be held to a higher standard regarding compliance with the automatic stay.  Pursuant to Section 362(k), the Debtor is entitled to recover actual damages, including costs and attorney's fees, from Laborde Earles for its intentional and willful violations of Section 362 of the Bankruptcy Code.  The Debtor incurred attorney's fees and costs in filing this adversary proceeding, including the payment of filing fees.

106.  Although Section 362(k) provides for individual recovery, courts in this district have employed their civil contempt powers under section 105(a) to address automatic stay violations, including damages, fees and punitive damages, when the plaintiff is not an individual. *Sanchez v. Ameriquest Mort. Co. ( In re Sanchez),* 375 B.R. 289, 309 (Bankr. S.D. Tex. 2007).

107.  Under Section 105(a), a bankruptcy court may issue any order that is necessary or appropriate to carry out the provisions of this title.

108.  Here, Laborde Earles' intentional violations of the automatic stay warrants the Court's intervention to determine the violation and utilize its equitable powers under Section 105(a) to enforce Section 362.

109.  The Court also possesses the authority under Section 105(a) to impose sanctions for civil contempt or as part of its equitable powers. As noted by the Fifth Circuit, "Judicial sanctions in

civil contempt proceedings may, in proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Sanchez v. Ameriquest Mort. Co. ( In re Sanchez),* 375 B.R. 289, 309 (Bankr. S.D. Tex. 2007) (citing *American Airlines Inc. v. Allied Pilots Ass'n,* 228 F. 3d 574, 585 (5th Cir. 2000).

110.   "The automatic stay is a self-executing injunction, and therefore for contempt purposes it constitutes an order of the bankruptcy court." *Sanchez v. Ameriquest Mort. Co. ( In re Sanchez),* 375 B.R. 289, 309 (Bankr. S.D. Tex. 2007)

111.   Consequently, the Debtor seeks actual damages and sanctions against Laborde Earles for its intentional violations of the automatic stay.

## <u>CAUSE OF ACTION #2 – DECLARATORY JUDGMENT</u>

112.   The Debtor incorporates Paragraphs 9 -12, 15 – 22, and 57 – 61 into Cause of Action #2.

113.   When considering a declaratory judgment action, the Court must engage in a three-step inquiry: (1) whether an "actual controversy" exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether "to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000)

114.   To date, the Debtor is aware of at least 1,811 MMA Cases that Laborde Earles acquired following the Suspension Order (the, **"LE/Debtor Cases"**).

115.   The Debtor seeks a declaratory judgment pursuant to 11 U.S.C. § 541 affirming that the Debtor's interest in the attorney's fees and costs in all of the LE/Debtor Cases (outlined in the attached Spreadsheet at Exhibit 10) are property of the bankruptcy estate.

116.    The Debtor performed work and incurred costs and expenses in the LE/Debtor Cases.  The Debtor is entitled to a contingency fee and reimbursement of expenses in the LE/Debtor Cases. ("**Total Fees and Costs**").

117.    To date, the Debtor has not received the Total Fees and Costs from any party in the LE/Debtor Cases.  An actual controversy now exists between the Debtor and Laborde Earles regarding entitlement to the Total Fees and Costs in the LE/Debtor Cases.

118.    Laborde Earles acknowledges the dispute over the Total Fees and Costs, as evidenced by its pre-petition motion filed in the district court putting the Debtor on notice that a motion to set attorneys fees and costs will be filed to address any fees and costs that may be owed to the Debtor[31].

119.    The Debtor asserts that it has not relinquished its right to claim an interest in any portion of the settlement proceeds from the LE/Debtor Cases.

120.    Under Louisiana law, when two attorneys provide legal services to the same client on a contingency-fee basis and one attorney is discharged before resolution, the client is obligated to pay only one contingency fee, which the court allocates between the attorneys. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102 at 108 (La. 1979).

121.    The amount of the fee is determined by the highest ethical contingency percentage agreed upon in any of the contingency fee contracts executed by the client.  *O'Rourke v. Cairns,* 683 So. 2d 697, 702 (La. 1996).

122.    Fee apportionment considers factors such as: 1) the time and labor required; 2) novelty and difficulty of questions involved; 3) skill required to perform legal services; 4) amount involved and the results obtained; and 5) nature and length of the professional relationship with

---

[31] Exhibit 20: Senegal Motion

the client. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102 (La. 1979).

123.    This ensures a reasonable division of fees based on each attorney's contributions. If the first attorney was not discharged for cause, this analysis concludes the determination. However, if discharged for cause, the court must assess the nature and gravity of the discharge to determine if the discharged attorney is entitled to any fees. *O'Rourke v. Cairns,* 683 So. 2d 697, 702 (La. 1996).

124.    Here, the Debtor was not discharged for cause, but even if the Court were to determine that it was, then the Debtor is still entitled to a determination of fees and costs under the reasonableness factors discussed above.  Therefore, there is a live controversy between the Debtor and Laborde Earles as to who is entitled to the Fees and Costs arising from every single one of the LE/Debtor Cases as outlined in the attached spreadsheet at Exhibit 10.

125.    Therefore, the Debtor contends that it is entitled to its reasonable share of the Total Fees and Costs in the LE/Debtor Cases and seeks a declaratory judgment to this effect.

### **CAUSE OF ACTION #3: TURNOVER OF PROPERTY OF THE ESTATE**

126.    The Debtor incorporates Paragraphs 9 -12, 14-22, 45, 57-87 into Cause of Action No. 3.

127.    Pursuant to Section 541(a)(1) of the Bankruptcy Code, "property of the estate" encompasses "all legal and equitable interest of the debtor in property as of the commencement of the case". 11 U.S.C. §541.

128.    Section 542(a) mandates that an entity possessing property of the estate must deliver and account for such property, or its equivalent value, to the bankruptcy estate. 11 U.S.C. § 542.

129.     To date, the Debtor is aware of at least 1,811 MMA Cases that Laborde Earles acquired following the Suspension Order (the, **"LE/Debtor Cases"**).   The Debtor performed significant work and incurred costs and expenses in the LE/Debtor Cases.   The Debtor is entitled to a contingency fee and reimbursement of expenses in the LE/Debtor Cases. ("**Total Fees and Costs"**).   Therefore, in the present matter, In the present matter, the Debtor has an interest in the Total Fees and Costs associated with the Le/Debtor Cases.

130.     The Debtor has not waived its rights to the Total Fees and Costs in the Le/Debtor Cases.

131.     Laborde Earles currently holds or has received a portion of the Total Fees and Costs, which were obtained through the settlement of numerous of the LE/Debtor Cases, both prior to and subsequent to the filing of the Debtor's Chapter 11 petition. Post-petition, the Debtor is aware of at least 36 36 LE/Debtor Cases that Laborde Earles has settled, totaling $906,514.47 in settlement funds.   Furthermore, the Debtor has provided Laborde Earles with case expenses on approximately 100 additional LE/Debtor Cases that are currently in the settlement stage.

132.     The Debtor asserts that the Debtor has an interest in the Fees and Costs and respectfully requests that this Court issue an order compelling Laborde Earles to provide a comprehensive accounting of all funds received in connection with the LE/Debtor Cases to date.

133.     The Debtor further requests that this Court issue an order directing turnover of the Total Fees and Costs from the LE/Debtor Cases that Laborde Earles has received to date.

Dated: October 28, 2024

Respectfully submitted,

By: */s/Miriam T. Goott*

Miriam T. Goott
SBN #24048846
COUNSEL FOR DEBTOR

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301 Houston, TX
77208-1301 (713)956-5577
Phone (713)956-5570 Fax
mgoott@walkerandpatterson.com

## CERTIFICATE OF SERVICE

I, Miriam Goott, hereby certify that I served a copy of this Amended Complaint on counsel for Laborde Earles via email on October 28, 2024.

Dated: October 28, 2024

Respectfully submitted,

By: /s/Miriam T. Goott

Miriam T. Goott
SBN #24048846
COUNSEL FOR DEBTOR